**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| LERCH BATES, INC., <br><br> Plaintiff, <br><br> v. <br><br> MICHAEL BLADES & ASSOCIATES, LTD., <br><br> Defendant. | Civil Action No. 20-2223 (BAH) <br><br> Judge Beryl A. Howell |

## <u>MEMORANDUM OPINION</u>

Plaintiff Lerch Bates, Inc. has sued defendant Michael Blades & Associates, Ltd., which was started in 2005 by plaintiff's former management employee and is a competitor in the elevator consulting industry, for alleged unauthorized copying of an elevator specification template partially developed and used by plaintiff in connection with its consulting services. *See* First Am. Compl. ¶¶ 34-53 (alleging claim of copyright infringement, pursuant to the Copyright Act, 17 U.S.C. § 101, *et seq.*, and unauthorized removal of copyright management information, pursuant to 17 U.S.C. §§ 1202(b), 1203), ECF No. 37. Instead of statutory damages or actual damages for defendant's alleged infringement, the remedies plaintiff seeks for the alleged copyright infringement are injunctive relief, attorneys' fees and costs, and the portion of defendant's profits causally related to the alleged infringement, pursuant to 17 U.S.C. § 504(b), even though defendant indisputably secures consulting agreements with its clients without using or revealing to clients the allegedly infringed specification template beforehand, and the engineering principles underlying the elevator specifications themselves and commonly used industry terms incorporated into plaintiff's template are not copyrightable.

1

Now pending before the Court are competing motions by the parties.  Plaintiff seeks partial summary judgment on the issue of liability for its copyright infringement claim and concomitant entitlement to defendant's profits under § 504(b), *see* Pl.'s Revised Mot. Partial Summ. J. ("Pl.'s Rev. Mot."), ECF No. 75; *see also* Pl.'s Sealed Mem. Supp. Rev. Mot. ("Pl.'s Mem."), ECF No. 74-1, while defendant's cross-motion seeks partial summary judgment solely on the issue of its § 504(b) liability with respect to plaintiff's copyright claim, *see* Def.'s Cross-Mot. Summ. J. ("Def.'s Cross-Mot."), ECF No. 60.  For the below reasons, plaintiff's motion is denied, and defendant's cross-motion is granted.[1]

## I.     BACKGROUND

The relevant factual background and procedural history of this matter are described below.

### A.      Factual Background

#### 1.      *Plaintiff's Background and Its Specification Template*

Plaintiff has conducted business in the vertical transportation (i.e. elevator) consulting industry since 1947, advising clients, which includes building owners and managers, about the purchase of new equipment, maintenance and modernization of existing equipment, and the occasional purchase of a building with elevator equipment.  Pl.'s Sealed Statement of Facts ("Pl.'s SMF") ¶¶ 1-3, ECF No. 74-1.[2]  As part of this consulting work, plaintiff uses the allegedly infringed document at issue in this lawsuit, namely, "a detailed 49 page Microsoft Word

---

[1]      The parties have filed under seal several exhibits and their memoranda in support and opposition to each other's respective motions for summary judgment, because those filings contain some material covered by a protective order.  *See* Protective Order, ECF No. 31.  To the extent such otherwise sealed material is revealed in this Memorandum Opinion, that information is unsealed in order to explain the Court's reasoning.  *See In re WP Co. LLC*, 201 F. Supp. 3d 109, 116 n.4 (D.D.C. 2016) (citing *United States v. Reeves*, 586 F.3d 20, 22 n.1 (D.C. Cir. 2009)).

[2]      Plaintiff refers to two types of elevator consulting projects undertaken by both parties: elevator "modernization" projects and "new" elevator construction projects, without describing the difference between the two.  *See, e.g.*, Pl.'s SMF ¶ 37.  Elevator "modernization" projects presumably refer to projects in which clients want to modernize or update existing elevator systems, by contrast to "new" elevator construction projects, in which clients request assistance in installing new elevator systems in buildings.

template[,] which is essentially an instruction manual for generating Elevator Design Proposals[,]" First Am. Compl. ¶ 14, that "specifically deal[s] with electric traction elevators, also known as Section 14210," *id.* ¶ 12. This template ("LB Template") is used to provide specifications for particular elevator construction projects and generate "bids and plans for the construction of elevators in the buildings for which they are intended," *id.* ¶ 9, and generally serves as a reference tool by the contractors and the design team for the project, Pl.'s SMF ¶¶ 4-5. If asked by the client, plaintiff will use the specifications to confirm that the construction complies with the project's requirements, but otherwise leaves such construction compliance to the client, building manager, or contractor. *Id.* ¶ 6.

In 2019, plaintiff received a copyright for the 2009 version of the LB Template with Registration No. TX 8-730-900, *id.* ¶ 9; *see also* Pl.'s Rev. Mot., Decl. of John ("Jack") Tornquist ("Tornquist Decl.") ¶ 6, Ex. 1, Certified Deposit from the U.S. Copyright Office ("Registration"), ECF No. 75-12, though Plaintiff's certificate of registration indicates that the LB Template was first published on September 25, 2009, a decade prior to the issuance of the copyright registration. Def.'s Sealed Opp'n Pl.'s Rev. Mot. Summ. J. ("Def.'s Opp'n"), Ex. 4 (SEALED), Certificate of Registration for Lerch Bates Traction Elevator Manual and Specification ("Certificate of Registration") at 1, ECF No. 79-5. Plaintiff claims the LB Template was circulated to its employees in 2009—notably several years after defendant's founder Michael Blades had left plaintiff's employ—"for the sole purpose of producing specifications for elevator design projects for Lerch Bates, without authorization to reproduce or distribute" the LB Template. Pl.'s SMF ¶ 10.

Plaintiff concedes that the LB Template does not consist entirely of plaintiff's original work. *See* Pl.'s SMF ¶¶ 15-16. To the contrary, the LB Template is structured in essentially the

same format and contains information generally recommended by the Construction Specifications Institute ("CSI"), *id.* ¶ 15, which is "a national not-for-profit association" that, *inter alia*, develops and issues "standards and formats." *See* Construction Specification Institute, "About Us", https://perma.cc/AT4L-X6MX.  Plaintiff describes CSI as having "a certification of expertise in the field of specification preparation."  Pl.'s Sealed Resp. Def.'s SMF ¶ 9, (quoting Pl.'s Opp'n Def.'s Cross-Mot. Summ. J. ("Pl.'s Opp'n"), Ex. 3, Excerpt of Apr. 15, 2022 Dep. Tr. of Jack Tornquist ("Tornquist Dep. Tr.") at 38:13–40:1, ECF No. 78-3), ECF No. 83.[3]  Indeed, plaintiff admits to obtaining "input" from CSI regarding use of "the number 14210 on its specification template," *id.*, possibly because CSI appears to sell, under the trademarked name "CSI MasterFormat," a master template designated as "Section 14210" for detailed construction project specifications and cost estimates for electric traction elevators.  "[T]o be consistent with CSI standards," Pl.'s SMF ¶ 16, for instance, the LB Template has a three-part layout, with parts entitled "'General,' (Section 1) 'Products,' (Section 2) and 'Execution,' (Section 3)," just like CSI's Section 14210 template, and the LB Template includes certain topics consistent with and required by CSI's template, *id.*; *see also* Def.'s Opp'n, Ex. 1 (SEALED), Tornquist Dep. Tr. at 38:13–40:22, ECF No. 79-2 (plaintiff's EVP testifying that plaintiff "mimicked" "the three sections" and "the general format" of CSI's template).[4]

Plaintiff maintains that "[e]ach numbered section of [the LB Template] conveys important information which a building owner, project manager, or contractor would need to know in connection with preparing (or accepting) a bid for an elevator construction project[,]" and that

---

[3]	Jack Tornuqist has "worked with Lerch Bates Inc. since 1981," beginning first as a consultant, then rising to the role of executive vice president ("EVP") in the mid-1990s, a position to which he returned in 2011, putting him in charge of plaintiff's "operations in the western United States." Tornquist Decl. ¶¶ 3-5.

[4]	No CSI's MasterFormat Section 14210 template from 2009, or any other time, is provided in the record by either party for comparison purposes.

"[w]hen a consultant creates project specifications, the consultant may use different sections of text from [the LB Template] depending on the specifics of the project." Pl.'s SMF ¶ 18. Until the LB Template is "customiz[ed]" for a specific project, the Template is "not useful [for] any specific project." Def.'s Cross-Mot., Ex. 5, Tornquist Dep. Tr. at 156:12–157:2, ECF No. 60-3. Except when access is provided to one of plaintiff's employee consultants for use in a specific project, the LB Template is otherwise kept "under lock and key." Def.'s Sealed Statement of Facts ("Def.'s SMF") ¶ 10 (quoting Def.'s Cross-Mot., Tornquist Dep. Tr. at 120:1–2), ECF No. 60. When the LB Template is modified by the consultant for a particular project, the customized version is provided only to the project owner, unless the project owner designates another recipient on the project. *Id.* ¶ 11. While plaintiff's EVP testified that the LB Template has value because the document is recognized in the marketplace, he could not identify a single instance where another industry participant recognized the LB Template. *Id.* ¶ 12.

To demonstrate the added value that the LB Template provides over CSI's Section 14210 template, plaintiff points out that "[t]he majority of the topics in Section 2 and 3," as set out on the LB Template, are "additional topics." Pl.'s SMF ¶ 16. Plaintiff has submitted a version of the LB Template, with highlighted text plaintiff admits did not originate with plaintiff and claiming that the "wording without highlights, however, was drafted by" plaintiff. Pl.'s Rev. Mot., Tornquist Decl. ¶ 7, ECF No. 75-11; *see also id.*, Ex. 1, Certified Copy of Section 14210 ("LB Template"), ECF No. 75-12; *id.*, Ex. 2, Copy of Section 14210 ("Highlighted LB Template"), ECF No. 75-13. According to plaintiff, its employees drafted the unhighlighted text in the LB Template "based on their experience in the field performing consulting roles with clients[,]" and "[i]n creating this document, it was Lerch Bates['] policy to create its own language and not to copy wording from publicly available sources, like generic elevator specifications." Tornquist Decl. ¶ 7. Plaintiff's

EVP testified, however, that he could not "tie any specific language in that document [referring to the LB Template] to any specific contribution from any employee[,]" and, "as far as what was contributed by others besides" him, he could not say precisely where the information that plaintiff's employees "contributed came from."  Def.'s Opp'n, Ex. 1 (SEALED), Tornquist Dep. Tr. at 148: 3–11, ECF No. 79-2.

Plaintiff does not indicate how its "policy" to "create" the LB Template's text, rather than copy language from other sources, was implemented, enforced, or verified in the development of the LB Template.  In plaintiff's retelling of the history of the LB Template, the development process was underway during the period, from 1998 until 2005, when Michael Blades, the eponymous owner and founder of defendant, worked there, first as a consultant and eventually promoted to plaintiff's regional vice president.  Pl's SMF ¶¶ 20-21.  Plaintiff says that Blades "participated in Lerch Bates' efforts to develop and harmonized [sic] the language Lerch Bates uses in its Section 1420," and those early "versions would have contained most of the same language found in the published version of" the LB Template with the Copyright Office.  Pl.'s SMF ¶¶ 21-22; *see also* Pl.'s Sealed Reply Supp. Pl.'s Rev. Mot. Summ. J. ("Pl.'s Reply"), Supplemental Decl. of Jack Tornquist ("Tornquist Suppl. Decl.") ¶¶ 2-4 (explaining that the "working copy of" the LB Template to which Blades had access when employed at plaintiff "was not fundamentally different from" the version of the LB Template distributed to plaintiff's employees in 2009), ECF No. 81-5.

For his part, Blades admits that he had access to plaintiff's previous specification and bidding documents while in plaintiff's employ and testified that the source of the language used in these documents came from "many different resources coming from many different places," such as the American Institute of Architects, "resources that were manufacturers' information that was

gleaned off the web," and "many [other] different sources from the construction industry." Def.'s Opp'n, Ex. 2 (SEALED), Excerpt of Apr. 12, 2022 Dep. Tr. of Michael Blades ("Blades Dep. Tr.") at 45:20–47:2, ECF No. 79-3; *see also* Pl.'s Reply, Ex. 3, Def.'s Suppl. Resps. & Objs. Pl.'s Second Set of Discovery Reqs. ("Def.'s Rog. Resp.") at 3 (defendant admitting that Blades had "access" to a specification "utilized by plaintiff" while he worked with plaintiff until his departure in 2005, though that document "was a living, breathing document that was adjusted in varying degrees on a project by project [sic] basis to fit the specific needs of each project"), ECF No. 81-3.  In other words, if plaintiff is correct that Blades contributed to the development of pre-2005 versions of the LB Template, then the sources of the text in that template may stem from many different public sources and resources, based on Blades' recollection of the internal development process.  At the same time, Blades steadfastly maintains that he did not take any of plaintiff's bidding and specification documents with him when his employment with plaintiff ended in 2005, and that he had not even seen a copy of the LB Template prior to the instant lawsuit.  *See* Def.'s Sealed Statement of Genuine Issues & Material Facts Precluding Summ. J. ("Def's Opp'n SMF") ¶¶ 2-3, ECF No. 79-1; *accord* Blades Dep. Tr. at 153:2–15.  Defendant further denies that the bid and specification documents to which Blades had access before 2005 were "the same as the 2009 version of the LB Specification Template that Plaintiff claims it distributed on a 'limited publication' basis."  Def.'s Opp'n at 13 n.3, ECF No. 79-1.

Plaintiff did not produce in discovery pre-2005 drafts of the LB Template, explaining that plaintiff "no longer has access to any versions of the LB Template preceding its 200[9] edition, and cannot locate any bidding materials it prepared using" the LB Template "during the 2005 timeframe[,]" citing plaintiff's "document retention policy requiring the destruction and deletion of client files after seven years."  Tornquist Suppl. Decl. ¶ 5.  Consequently, comparison of pre-

2005 versions of plaintiff's bidding and specification documents with the copyrighted 2009 version of the LB Template cannot be performed, nor can witnesses' descriptions comparing those documents be verified by showing them the actual records, leaving a gap in concrete documentation along with differing stories about the precise source of the claimed copyrightable portions of the LB Template.

### 2. *Defendant's MBA Template*

Michael Blades founded defendant in 2005 and competes with plaintiff in the elevator construction and renovation consulting industry. Pl.'s SMF ¶ 23.[5] Blades testified that he "created" defendant's own specification template ("MBA Template") in 2005, and that he never saw the LB Template "whether it be copyrighted [or] uncopyrighted" prior to creating the MBA Template. Blades Dep. Tr. at 153:2–15. Defendant uses the MBA Template for its projects, which template details "certain materials and products to be used, quality and safety standards, product and construction warranty requirements, and other required information for use in soliciting bids from elevator subcontractors on behalf of the project owner." Def.'s SMF ¶ 2.[6] The MBA Template, like the LB Template, is "a modifiable form that is completed and then shared with

---

[5]       Plaintiff has plainly felt the sting of losing business to its former employee's consulting business. Plaintiff, for example, explained, in declining to produce its bid proposals for two consulting projects in response to defendant's Request for Production, that plaintiff "*by definition* [did] not have bid proposals for elevator specifications for the Flour Mill or US Mint projects due to the simple fact that it was never hired to prepare these documents: [defendant] was hired as the consultant for these projects." Pl.'s Resp. Court's Sept. 29, 2022 Minute Order ("Pl.'s Resp.") at 23 (emphasis in original), ECF No. 54. Less than a year after plaintiff apparently lost the Flour Mill condominium project to defendant, *see id.*, Ex. 17 (SEALED) at 1, Pl.'s May 14, 2019 Modernization Consulting Services Proposal for Flour Mill Condo, ECF No. 55-2, plaintiff sent its second cease-and-desist letter to defendant and a few months later, filed this lawsuit.

[6]       Almost one hundred versions of the MBA Template, with each customized for specific projects as part of defendant's consulting business, have been submitted to the Court. *See infra* Section I.A.3. Nonetheless, plaintiff complains that defendant "has failed to produce its template in discovery and admitted in deposition to having made no effort to search for it despite Lerch Bates' discovery requests requesting the template." Pl.'s Sealed Statement of Add'l Material Facts ¶ 2, ECF No. 83. This criticism seems hyperbolic since 98 copies of the MBA Template, as actually used with clients, have in fact been produced.

elevator subcontractors bidding on the work." Def.'s Cross-Mot., Ex. 1, Decl. of Michael Blades ("Blades Decl.") ¶ 4, ECF No. 60.

Defendant describes the process of securing a consulting agreement with a project owner as involving three phases: (1) the "Construction Documents" phase; (2) the "Bidding and Negotiation" phase; and (3) the "Construction Services" phase. Def.'s SMF ¶ 8. With respect to payment, defendant's consulting agreements typically contain fee schedule terms requiring that defendant be paid at each phase of the consulting agreement process, including the "Construction Documents" phase. Pl.'s SMF ¶¶ 37-38. Once the consulting agreement between defendant and a property owner is executed, defendant enters the "Construction Documents" phase, during which the MBA Template is modified by one of defendant's employee consultants and the project owner is given access to the information in the customized MBA Template. Def.'s SMF ¶ 16; Blades Decl. ¶ 9. The MBA Template customized with information pertaining to a particular project constitutes the "bidding materials" for that project. *See* Pl.'s SMF ¶ 24.

Defendant then enters the "Bidding and Negotiation" phase of the consulting agreement. The example consulting agreement for an elevator modernization project provided by defendant describes defendant's services during this phase as including dispatching "bid documentation to pre-qualified elevator contractors," providing "manpower to assist in the necessary walk-thru process to examine the elevator systems[,]" holding discussions with the elevator contractors, as necessary, "to answer any queries or telephone clarifications[,]" issuing modifications to the customized MBA Template as necessary, providing, as necessary, "a spreadsheet analysis of the bid proposals[,]" attending "interview meetings with the client to hold discussions with bidders whose proposals are viable and competitive[,]" and issuing a recommendation "for the contract

award based on the bid proposal review and contract interviews."  Def.'s Cross-Mot., Ex. 6 (SEALED), Sample Consulting Agreement at 11, ECF No. 61-3.

After the client chooses a contractor to execute the project, defendant and its client enter the "Construction Services" phase, during which at least some of defendant's consulting agreements require that defendant review the work of the contractor performing the elevator modernization or construction service to confirm that the work is proceeding in accordance with the customized MBA Template for that project.  Pl.'s SMF ¶ 39.  For example, defendant's Sample Consulting Agreement shows that, during this phase of the project, defendant conducts "progress reviews during the modernization of each elevator to determine that work is proceeding in accordance with the Construction Documents" and submits a "written report" to the client accompanying those progress reviews.  Sample Consulting Agreement at 11.

### 3.   *Similarities between Plaintiff's LB Template and Defendant's MBA Template*

Plaintiff has submitted, as exhibits, 98 of defendant's customized MBA Templates for different elevator modernization and new construction projects that defendant produced in discovery and plaintiff compared to its LB Template**.**  In making this comparison, plaintiff highlighted portions of the customized MBA Templates that "represent instances where the language used in the exhibits is a verbatim or near-verbatim copy of the language reflected in" the LB Template and that plaintiff claims is copyrightable and authored by plaintiff, rather than language lifted from the CSI master template or other sources.  *See* Pl.'s SMF ¶¶ 25-27; *see also* Tornquist Decl., Exs. 4–41 (SEALED), Highlighted Versions of Def.'s Bidding Materials for Elevator Modernization Projects, ECF Nos. 74-2–74-41; *id.*, Exs. 42–101 (SEALED), Highlighted Versions of Def.'s Bidding Materials for New Elevator Construction Projects, 74-42–74-101 (collectively, as to both Elevator Modernization Projects and New Elevator Construction Projects,

"Highlighted MBA Customized Templates"). Defendant describes the highlighted text as reflecting "information" that "could be requested by other elevator consultants in a project specification to an elevator contractor[,]" Def.'s SMF ¶ 7, and explains that "[m]ost of the identical words are industry terms of art, definitions[,] and functional language," Def.'s Sealed Resp. Pl.'s SMF ("Def.'s Resp. SMF") ¶ 25, ECF No. 79-1.

Examples of the highlighted text excerpts from defendant's customized MBA Templates that plaintiff claims infringe the LB Template, *see* Def.'s SMF ¶ 6; Pl.'s SMF ¶ 36, include the following:

- "In order to discover and resolve conflicts or lack of definition which might create problems, Contractor must review Contract Documents, existing site conditions, and existing equipment specified to be retained for compatibility with its product prior to submitting quotation." Def.'s Cross-Mot., Ex. 11, Pl.'s First Set of Discovery Requests ("Text Excerpts") at 9, ECF No. 60-6.

- "Acknowledge and/or respond to review comments within 14 calendar days of return. Promptly incorporate required changes due to inaccurate data or incomplete definition so that delivery and installation schedules are not affected.  Identify and cloud drawing revisions, including Contractor elective revisions on each re-submittal.  Contractor's revision response time is not justification for equipment delivery or installation delay." *Id.*

- "Contractor shall perform review and evaluation of all aspects of its work prior to requesting Consultant's final review.  Work shall be considered ready for Consultant's final contract compliance review when copies of Contractor's test and review sheets are available for Consultant's review and all elements of work or a designated portion thereof are in place and elevator or group of elevators are deemed ready for service as intended." *Id.* at 10.

The parties contest the extent to which defendant's customized MBA Templates contain the same or similar language as in the LB Template and the import of such similar language being used.  As to the extent of the similarity in language used in both parties' templates, plaintiff asserts that customized MBA Templates, designated as Exhibits 4 through 41, "other than 18, 21, 22, 25, 39 and 40, reflect verbatim copying of over half of the material in" the LB Template, while

customized MBA Templates, designated as "Exhibits 43 through 101 . . . also reflect copying of substantial portions [of] the material[.]"  Pl.'s SMF ¶ 27 (citing Tornquist Decl. ¶ 23); *see also* Highlighted MBA Customized Templates.

Defendant disputes plaintiff's summary characterization of the similarities between the parties' templates, asserting that plaintiff "has relied on an online software program without documentation of its reliability or dependence on expert testimony" to identify alleged "verbatim or near-verbatim copying" of the LB Template in customized MBA Templates.  Def.'s Resp. SMF ¶ 25.  By way of contrast, defendant indicates that its own plagiarism software revealed that the similarity of two customized MBA Templates to the LB Template ranges from 22 percent similarity to 10.1 percent overall similarity, *id.*, stressing that "[m]ost of the identical words are industry terms of art, definitions[,] and functional language," *id.*  Only in reply did plaintiff clarify the process used to identify similarities between the two templates: rather than use any software program to assess similar language used in both the LB Template and the customized MBA Templates, plaintiff's EVP simply eye-balled the text, explaining that "when [he] previously submitted [his] declaration comparing the highlighted portions of the Blades bidding materials with the 2009 version of [the LB Template], [he] personally compared the highlighted exhibits with the 2009 version of the [Template], relying also on [his] personal knowledge of" the LB Template.  Tornquist Suppl. Decl. ¶ 1; *accord* Pl.'s Reply at 9, ECF No. 84.

With respect to the nature or import of the similarities, plaintiff's EVP insists that highlighted text excerpts from the customized MBA Template templates "reflect[] copying of important parts of the language contained in" the LB Template, Tornquist Decl. ¶ 22, without providing any additional explanation or support as to why the similar language is anything other than "industry terms of art, definitions and functional language," as defendant posits, or otherwise

unique to the LB Template or important in some other way.  For example, some of highlighted text from the customized MBA Templates that plaintiff claims to be copyrighted appear to be straight-forward, simply phrased instructions of questionable protectability as copyrighted, such as "Contractor must review Contract Documents[.]", "Promptly incorporate required changes due to inaccurate data or incomplete definition."  Text Excerpts at 9.  Indeed, plaintiff's same witness provided testimony suggesting that the highlighted text excerpts from the customized MBA Templates are not unique to any elevator consultant or elevator project.  He confirmed, repeatedly, that "any information contained in the highlighted language" could be "ask[ed] for from the prospective bidders or users" by "other elevator consultants."  Def.'s Cross-Mot., Tornquist Dep. Tr. at 105:15–2;  *see also, e.g.*, *id.* at 116:12–18 (plaintiff's EVP agreeing that "other consultants can[] ask or direct in a specification that contractors' review contract documents, site conditions, and existing equipment for compatibility and conflicts"), *id.* at 117:11-19 (plaintiff's EVP agreeing that other consultants could ask about information in a text excerpt in their specification); *id.* at 117:20–118:20 (similar); 104:2–105:21; (similar) 105:12–21 (similar); 111:6–113:13 (similar).  In short, plaintiff's EVP conceded that "other consultants [could] ask the same questions, just using different phrasing[.]"  *Id.* at 117:7–10; *accord id.* at 104:2–15.

Plaintiff estimates that the total revenue defendant realized from the 98 MBA Template bids containing highlight text excerpts of copyrighted text from the LB Template is $2,846,708, with $1,373,092 attributed to the customized MBA Templates used in elevator modernization projects and $1,473,616 from new elevator construction projects, "excluding activity prior to the creation of the infringing Bidding Materials[.]"  Pl.'s SMF ¶¶ 42-43.  While not disputing the topline revenue numbers for these 98 projects, defendant counters that plaintiff's computation of the revenue total "does not account for the costs incurred by MBA regarding its projects,

specifically the payment by MBA to its employee of 50% of each payment that MBA receives from the project owner." Def.'s Resp. SMF ¶¶ 42-43.

### 4.  *Plaintiff's Discovery of Defendant's Alleged Infringement*

Plaintiff claims that defendant's alleged infringement of the LB Template came to its attention in February 2017, when defendant submitted a bid for the Saint James Condominium in Baltimore, Maryland, allegedly using information copied from the LB Template in connection with that project.  *See* Def's SMF ¶ 18; *see also* First Am. Compl. ¶¶ 21-22 (making a similar observation).  Over a year after plaintiff says it discovered defendant's alleged infringement, plaintiff sent, in March 2018, a cease-and-desist notice, instructing defendant to halt using copyrighted language from the LB Template, Pl.'s SMF ¶ 33; *see also* Def.'s Answer ¶ 24, ECF No. 44, and another such cease-and-desist letter, on February 4, 2020, Pl.'s SMF ¶ 33; *see also* Def.'s Answer ¶ 26.  All but 9 of the 98 customized MBA Templates relied upon by plaintiff were created and used after the first cease-and-desist letter was sent to defendant in March 2018.  Pl.'s SMF ¶ 34.

### B.  **Procedural Background**

Plaintiff initiated this lawsuit on August 12, 2020, bringing two claims against defendant, alleging, in Count One, that defendant directly infringed plaintiff's allegedly copyrighted work, and, in Count Two, that defendant engaged in unauthorized removal of copyright management information.  *See* Compl. ¶¶ 33, 43-45, ECF No. 1. When time passed with no activity after defendant did not timely answer, plaintiff was directed to show cause why the case should not be dismissed for failure to prosecute.  *See* Min. Order (Dec. 2, 2020) (citing D.D.C. LCvR 83.23). Faced with potential dismissal, plaintiff moved for an entry of default, Pl.'s Req. for Entry of Default, ECF No. 9, which the Clerk of Court entered against defendant on December 4, 2020, *see* Entry of Default, ECF No. 10.  Eventually, on May 24, 2021, defendant moved to set aside default,

*see* Def.'s Cross-Mot. Set Aside Default, ECF No. 18, which was subsequently granted, *see Lerch Bates, Inc. v. Michael Blades & Assocs., Ltd.*, No. CV 20-2223 (BAH), 2021 WL 3363414, at *7 (D.D.C. Aug. 3, 2021) ("Setting aside the Clerk's entry of default would not prejudice plaintiff, and defendant has presented meritorious defenses to plaintiff's claims[.] . . . Therefore, despite defendant's willful failure to timely respond to plaintiff's complaint, defendant has established good cause to set aside the entry of default.").

Plaintiff subsequently amended the Complaint on March 28, 2022, joining Michael Blades as a defendant, s*ee* First Am. Compl., and seeking against both defendants, as the remedies for Count One's claim of copyright infringement, "injunctive relief, as well as actual damages pursuant to 17 U.S.C. §§ 502, 504 and 505 in an amount to be proven at trial, plus an award of reasonable attorney's fees and costs." First Am. Compl. at 8–9.  As for Count Two's claim of unauthorized removal of copyright management information, which was brought solely against defendant Michael Blades & Associates, Ltd., plaintiff sought "actual damages or statutory damages pursuant to 17 U.S.C. § 1203 . . . as Lerch Bates may elect[,] plus an award of reasonable attorney's fees and costs."  First Am. Compl. ¶ 53.  On March 30, 2022, just two days after filing the amended complaint, plaintiff filed a notice of voluntary dismissal of defendant Michael Blades, under Federal Rule of Civil Procedure 41(a)(1)(A)(i), Pl.'s Notice of Voluntary Dismissal, ECF No. 38, and  Michael Blades was promptly dismissed as a defendant to this action, *see* Min. Order (Mar. 31, 2022).  Plaintiff thereafter withdrew its request for actual damages.  *See* Pl.'s Opp'n at 8, ECF No. 83.[7]

---

[7]     Plaintiff withdrew "its claim for statutory damages[,] pursuant to 17 U.S.C. § 504[,] [ ] when it amended its complaint" because defendant's "October 22, 2021 disclosures of its bidding materials demonstrated a continuous pattern of infringement pre-dating Lerch Bates' 2019 registration, making Lerch Bates' claim for statutory damages under 17 U.S.C. § 504(c) untenable."  Pl.'s Resp. at 19.

The parties were provided with a generous period of almost fourteen months to conduct discovery.  *See* Min. Order (Sept. 24, 2021) (directing parties to exchange initial disclosures required by Rule 26(a) by October 11, 2021); Min. Order (Dec. 8, 2022) ("Dec. 2022 Order") (directing plaintiff to complete a final production of documents to defendant by December 14, 2022).  Discovery, however, did not proceed smoothly.  After an unsuccessful four-month effort to resolve this dispute in mediation, *see* Min. Orders Referring Case to Mediation (May 6, July 1, July 15, 2022), in September 2022, plaintiff accused defendant of failing to produce bidding materials for new elevator construction projects for which language was allegedly copied from the LB Template, and defendant accused plaintiff of failing to produce discovery relating to plaintiff's then-still pending request for actual damages.  *See* Min. Order (Sept. 29, 2022) ("Sept. 2022 Order") (describing the parties' discovery dispute in their Sept. 29, 2022 email to the Court and directing parties to submit more fulsome explanations regarding their dispute); *see also* Pl.'s Resp.; Parties' Joint Resp. Order of the Court, ECF No. 57; Def.'s Resp. to Order of the Court, ECF No. 58.[8]  Prior to resolution of the parties' discovery dispute, on October 24, 2022, plaintiff moved for partial summary judgment, Pl.'s Mot. Summ J., ECF No. 63, and defendant filed its cross-motion, Def.'s Cross-Mot.

Upon consideration of the parties' responses to the September 2022 Order, and to resolve the parties' outstanding discovery disputes prior to resolution of dispositive motions, the briefing schedule on the parties' cross-motions was stayed.  *See* Min. Order (Nov. 4, 2022) ("Nov. 2022 Order").  The parties were each directed to produce additional discovery by November 21, 2022,

---

[8] In addition to the September 2022 discovery dispute, the parties raised multiple other discovery disputes, necessitating repeated judicial intervention, attention, and resolution with concomitant consumption of judicial resources.  *See, e.g.,* Min. Orders Regarding Discovery Disputes (Oct. 12, 2021; Oct. 15, 2021; Mar. 28, 2022; Apr. 13, 2022; Apr. 19, 2022).

and to file a joint status report regarding any outstanding discovery issues.[9]  The parties timely

filed their respective joint status reports, in which plaintiff continued to complain that defendant

had yet to "produce[] any documents substantiating its contention that it pays 50% of the value of

the 'bidding documents' phase of work to its consultants" or produce responses to plaintiff's

request for bidding documents regarding its elevator modernization projects, Pl.'s Status Report

in Resp. to Nov. 2022 Order at 2–3, ECF No. 66, and to which defendant disputed plaintiff's

characterization of any purported discovery failures, *see generally* Def.'s Status Report, ECF No.

67.  Plaintiff's request for additional discovery was denied because "[t]his non-complex copyright

case has been pending for over two years, that defendant's production of discovery has amounted

to thousands of pages, in addition to a spreadsheet summarizing defendant's revenues for 'new

elevator' construction projects, while plaintiff's production in response to the Discovery Order has

amounted to just one document" and that plaintiff could still seek additional discovery, if needed,

upon showing "'by affidavit or declaration that, for specified reasons, it cannot present facts

essential to justify its opposition' to summary judgment," and set a briefing schedule for the

parties' supplemental or amended briefs in support of their respective cross-motions for summary

judgment based on additional discovery produced in response to the November 2022 Order.  Dec.

2022 Order (quoting FED. R. CIV. P. 56(d)).[10]

---

[9]     The November 2022 Order directed plaintiff to respond to defendant's Request for Production No. 22, by providing "[a]ll documents, including elevator specifications, submitted by [plaintiff] for the purpose of bidding on any project[,]" Nov. 2022 Order (quoting Sept. 2022 Email at 7) (alterations in original), as to all bids made by plaintiff after August 12, 2017, including any "global proposal document" or "overall proposal documents," that plaintiff used, to allow defendant to determine the extent to which copied language exists in its own bidding materials, *id.* (citation omitted).  The same Order directed defendant to "(1) produce any and all bidding materials used for 'new' elevator construction projects after August 12, 2017 that would tend to indicate copying of plaintiff's materials [ ], and (2) provide all 'financial information substantiating its alleged costs,' for all projects at issue (inclusive of 'new' elevator construction projects that indicate [copying of the LB Template]), including all relevant documents concerning 'deductible expenses and the elements of profit attributable to factors other than the copyrighted work,' as described under 17 U.S.C. § 504(b)[.]"  *Id.* (citation omitted).

[10]     Plaintiff has moved for partial reconsideration of the December 2022 Order, *see* Pl.'s Rev. Mot. Part. Reconsideration of the Dec. 8 Order ("Pl.'s Discovery Mot."), ECF No. 69, seeking signed responses to defendant's

The parties then submitted revised and supplemental cross-motions. *See* Pl.'s Rev. Mot.; Def.'s Sealed Suppl. Mot. Summ. J., ECF No. 76-1.  With briefing complete, Pl.'s Reply; Def.'s Sealed Reply Supp. Mot. Summ. J. ("Def.'s Reply"), ECF No. 80, the parties' pending cross-motions are now ripe for resolution.

## II.    LEGAL STANDARD

Under Federal Rule of Civil Procedure 56, "[a] party is entitled to summary judgment only if there is no genuine issue of material fact and judgment in the movant's favor is proper as a matter of law." *Soundboard Ass'n v. FTC*, 888 F.3d 1261, 1267 (D.C. Cir. 2018) (quoting *Ctr. for Auto Safety v. Nat'l Highway Traffic Safety Admin.*, 452 F.3d 798, 805 (D.C. Cir. 2006)); *see also* Fed. R. Civ. P. 56(a).  When parties file cross-motions for summary judgment, each motion is viewed separately, in the light most favorable to the non-moving party, with the court determining, for each side, whether the Rule 56 standard has been met.  *See Baylor v. Mitchell Rubenstein & Associates, P.C.*, 857 F.3d 939, 952 (D.C. Cir. 2017) (when considering "cross-motions for summary judgment, [courts] must accord both parties the solicitude owed non-movants"); *see also CEI Wash. Bureau, Inc. v. DOJ*, 469 F.3d 126, 129 (D.C. Cir. 2006) (noting that "[i]t is of no moment that the parties filed cross-motions for summary judgment and that neither party explicitly argued that there are genuine disputes about material facts" because "[a] cross-motion for summary judgment does not concede the factual assertions of the opposing motion."); *Sherwood v. Washington Post*, 871 F.2d 1144, 1147 n.4 (D.C. Cir. 1989) ("The rule governing cross-motions

---

first interrogatories, "the contracts and documents on which [defendant] based its 'summary' of revenues and costs in connection with the projects recently disclosed on November 21, 2022," and "supplementation" of defendant's responses to plaintiff's first set of "interrogatories and requests for production regarding modernization projects after March of 2021[,]" Pl.'s Mem. Supp. Discovery Mot. at 1, ECF No. 69-1.  Defendant opposes plaintiff's requested relief, though notes that a signed copy of defendant's responses to plaintiff's first set of discovery requests has been produced.  *See generally* Def.'s Opp'n Pl.'s Discovery Mot., ECF No. 70.  As explained below, given that defendant is entitled to summary judgment on its liability under § 504(b), additional discovery on that issue is unnecessary and thus plaintiff's discovery motion is denied as moot.

for summary judgment . . . is that neither party waives the right to a full trial on the merits by filing its own motion; each side concedes that no material facts are at issue only for the purposes of its own motion." (quoting *McKenzie v. Sawyer*, 684 F.2d 62, 68 n.3 (D.C. Cir. 1982))).

## III.   DISCUSSION

In the pending cross motions, plaintiff seeks partial summary judgment on its copyright infringement claim, arguing that defendant infringed the LB Template as a matter of law, and each party seeks summary judgment on the issue of liability for profits tied to defendant's alleged infringement, under 17 U.S.C. § 504(b).   As explained below, plaintiff's motion for partial summary judgment on the issue of copyright infringement is denied because genuine issues of material fact exist that preclude summary judgment on this issue.   Meanwhile, on the parties' cross-motions for summary judgment on the issue of § 504(b) liability, judgment is granted to defendant because plaintiff has not shown a plausible causal connection between the alleged infringement, assuming such infringement occurred, and the defendant's profits.   These issues are addressed *seriatim*.

### A.   Genuine Issues of Material Fact Preclude Summary Judgment on Plaintiff's Copyright Infringement Claim

"The Copyright Act protects 'original works of authorship fixed in any tangible medium of expression.'"   *Am. Soc'y for Testing & Materials v. Public.Resource.Org, Inc.*, No. 22-7063, 2023 WL 5918491, at *2 (D.C. Cir. Sept. 12, 2023) (quoting 17 U.S.C. § 102(a)).   "Liability under the Copyright Act attaches where one party infringes another's valid copyright."   *Spanski Enters., Inc. v. Telewizja Polska, S.A.*, 883 F.3d 904, 909 (D.C. Cir. 2018).   "To establish copyright infringement," a plaintiff "must prove '(1) ownership of a valid copyright, and (2) copying of constituent elements of the work that are original.'"   *IMAPizza, LLC v. At Pizza, Ltd.*, 965 F.3d 871, 876 (D.C. Cir. 2020) (quoting *Stenograph L.L.C. v. Bossard Assocs., Inc.*, 144 F.3d 96, 99

(D.C. Cir. 1998) (quoting *Feist Pub'ns, Inc. v. Rural Tel. Serv. Co.* ("*Feist*"), 499 U.S. 340, 361 (1991)).   While "facts themselves are not copyrightable, the Copyright Act recognizes that collections or compilations of facts may possess the originality necessary for copyright protection." *Experian Info. Sols., Inc. v. Nationwide Mktg. Servs. Inc.*, 893 F.3d 1176, 1181 (9th Cir. 2018); *accord* 17 U.S.C. § 103.[11]   As the Supreme Court has explained, "choices as to selection and arrangement, so long as they are made independently by the compiler and entail a minimal degree of creativity, are sufficiently original that Congress may protect such compilations through the copyright laws." *Feist*, 499 U.S. at 348.

Even assuming that plaintiff has satisfied the first element—that the LB Template is a copyrightable "compilation" under *Feist*—plaintiff must still show that, as a matter of law, defendant copied the LB Template at its protectible level of expression.[12]   The requisite copying

---

[11]     A "compilation" is defined under the Copyright Act as "[1] a work formed by the collection and assembling of preexisting materials or of data [2] that are selected, coordinated, or arranged in such a way that [3] the resulting work as a whole constitutes an original work of authorship."  17 U.S.C. § 101.

[12]     Assuming the LB Template is copyrightable avoids having to resolve the parties' dispute on this issue at the summary judgment stage, but this may be an issue at trial.  Plaintiff largely sidesteps the issue of whether the LB Template is an original work of authorship, and therefore copyrightable, relying on the copyright registration for a presumption of copyright validity, pursuant to 17 U.S.C. § 410(c). Pl.'s Mem. at 12–13.  The Copyright Act provides that possession of a certificate of registration from the U.S. Copyright Office "made before or within five years after first publication of the work shall constitute prima facie evidence of the validity of the copyright[,]"creating a rebuttable presumption of ownership of a valid copyright.  17 U.S.C. § 410(c); *accord MOB Music Publ'g v. Zanzibar on the Waterfront, LLC*, 698 F. Supp. 2d 197, 202 (D.D.C. 2010).  For a copyright registered more than five years after the work was published, the "evidentiary weight to be accorded . . . shall be within the discretion of the court." 17 U.S.C. § 410(c); *accord Am. Soc'y for Testing & Materials v. Pub.Resource.Org, Inc.*, 597 F. Supp. 3d 213, 230 (D.D.C. 2022).
        Plaintiff's certificate of registration indicates that the LB Template was first published on September 25, 2009, ten years prior to the date of registration, with the result that plaintiff's registration for the LB Template is not eligible for the statutory rebuttable presumption of validity.  Certificate of Registration at 1.  Plaintiff strains to argue otherwise, asserting that the publication in 2009 was "limited" to its employees "without the right of diffusion, reproduction, distribution, or sale" of the LB Template, Pl.'s Mem. at 12–13, but the Certificate of Registration does not specify that the 2009 publication was so limited.  *See* Certificate of Registration.  Defendant points out that "the version of Plaintiff's September 25, 2009 specification [was] never [ ] produced in discovery, despite request[,]" Def.'s Opp'n at 11, and thus cannot be compared to the copyright registered version of the LB Template, leaving a gap in the record as to whether the publication attested to in the Certificate of Registration is the same limited publication to plaintiff's employees referenced by plaintiff, *see* Tornquist Decl. ¶ 10, particularly since plaintiff maintains that previous version of the LB Template were circulated internally prior to 2005, *see* Pl.'s SMF ¶¶ 21-22.  Given the differing stories about how plaintiff's employees crafted the allegedly copyrightable language in the LB Template, whether any evidentiary weight should be accorded to plaintiff's Registration remains an open question.  *See Metal*

by defendant "may be established either with direct evidence that a defendant 'copied' the protected work or by establishing: '(1) that defendant[] had access to the copyrighted work, and (2) the substantial similarity between the protectible material in plaintiff's and defendant['s] works." *DBW Partners, LLC v. Mkt. Sec., LLC*, No. CV 22-1333 (BAH), 2023 WL 2610498, at *3 (D.D.C. Mar. 23, 2023) (quoting *Prunte v. Universal Music Grp.*, 484 F. Supp. 2d 32, 40–41 (D.D.C. 2007)); *see also Feist*, 499 U.S. at 361. Plaintiff takes the circumstantial approach, arguing that defendant, through Blades, had access to previous versions of the LB Template and that defendant's customized MBA Templates are substantially similar to the LB Template. Pl.'s Mem. at 20–21. As the below discussion reveals, genuine issues of material fact preclude summary judgment as to each element.

### 1.    *Access*

Defendant persuasively argues that a genuine dispute of material fact exists as to whether he had access to the LB Template. *See* Def.'s Opp'n at 13–14. To demonstrate access, plaintiff must evince that "defendant had a reasonable opportunity to view or [an] opportunity to copy the allegedly infringed work." *La Resolana Architects, PA v. Reno, Inc.*, 555 F.3d 1171, 1178 (10th Cir. 2009) (alteration in original) (citation omitted). "In order to support a claim of access, a plaintiff must offer 'significant, affirmative and probative evidence.'" *Jorgensen v. Epic/Sony Recs.*, 351 F.3d 46, 51 (2d Cir. 2003) (quoting *Scott v. Paramount Pictures Corp.*, 449 F. Supp. 518, 520 (D.D.C. 1978), *aff'd*, 607 F.2d 494 (D.C. Cir. 1979)). A plaintiff seeking summary judgment on a copyright infringement claim, where, as here, a defendant disputes and denies

---

*Morphosis, Inc. v. Acorn Media Publ'g, Inc.*, 639 F. Supp. 2d 1367, 1374 (N.D. Ga. 2009) (observing that, "[i]n the context of originality," a certificate of registration obtained more than five years after the purportedly copyrighted work was first published "is not substantial" because "a claim to copyright is not examined for basic validity before a certificate issues") (citation omitted).

access, must show that no jury could find that defendant lacked an opportunity to view the copyrighted work.  *Cf. Armour v. Knowles*, 512 F.3d 147, 153 (5th Cir. 2007).  Plaintiff falls short of making this showing here.

To be sure, Blades was employed by plaintiff for over a decade until 2005, Pl's SMF ¶ 20, and has admitted to having access to an earlier form of a bidding specification document used by plaintiff at the time of his employment, *see* Def.'s Rog. Resp. at 3.  Plaintiff has not, however, produced in discovery any version of the bidding specification document extant at the time of Blades' employment with plaintiff to be able to compare that version with the 2009 version of the LB Template and thereby ascertain any substantial similarities between the two.  *See* Suppl. Tornquist Decl. ¶ 5 (plaintiff's EVP noting that plaintiff no longer has access to versions of the LB Template prior to the 2009 version).  Absent such concrete evidence, plaintiff tries to bridge the gap with the declaration from its EVP that plaintiff's bidding specification document to which Blades had access prior to 2005 was the precursor to the LB Template, *see* Pl.'s Mem. at 20 (citing Pl.'s SMF ¶ 22 (citing Tornquist Decl. ¶ 19)), and by pointing to defendant's admission that he had access to plaintiff's documents extant at the time he worked there, Pl.'s Reply at 8 (citing Def.'s Rog. Resp at 3).  Yet, plaintiff fails to grapple with the fact that Blades describes the earlier bid specification document to which he had access as a  "living, breathing document that was adjusted in varying degrees on a project by project [sic] basis to fit the specific needs of each project[,]" and that he could "not recall if any of the Text Excerpts were contained in the Lerch Bates['] specification at the time of his departure in 2005," Def.'s Rog. Resp. at 3.  In short, plaintiff builds a bridge too far to establish Blades' access to the LB Template, which was published several years *after* Blades' departure from plaintiff's employ.

Moreover, Blades testified under oath that he "created" the MBA Template for defendant in 2005, he never saw the LB Template "whether it be copyrighted [or] uncopyrighted" prior to creating the MBA Template, and he "didn't even know [plaintiff] had a copyrighted document . . . until this case arrived[.]" Blades Dep. Tr. at 153:2–15. Given that the LB Template was not published to its employees until 2009, Pl.'s SMF ¶ 10, and that the LB Template is otherwise kept "under lock and key," Def.'s SMF ¶ 10, Blades' testimony thus raises a genuine issue of material fact as to whether he had access to the same, or similar, version of the LB Template published in 2009 before he stopped working at plaintiff in 2005.

Plaintiff insists that summary judgment is nonetheless appropriate because "the similarities between the works in question are so striking as to preclude the possibility that the parties arrived independently at the same result." Pl.'s Reply at 8 (citing *Reyher v. Children's Television Workshop* ("*Reyher*"), 377 F. Supp. 411, 412 (S.D.N.Y. 1974); *Arnstein v. Porter*, 154 F.2d 464, 468 (2nd Cir. 1946)). Plaintiff's reliance on these decades-old, out-of-circuit cases is ironic since their holdings undermine, rather than help, its position. Indeed, in both cases, motions for summary judgement as to the issue of copyright infringement were denied. *See Reyher*, 377 F. Supp. at 412; *Arnstein*, 154 F.2d at 468. As the *Reyher* court observed, summary judgment should be denied on a copyright infringement claim if "there is the slightest doubt as to the facts." 377 F. Supp. at 412 (cleaned up); *accord Arnstein*, 154 F.2d at 468. Given the dueling accounts from Blades and plaintiff's EVP on the issue of whether Blades, while in plaintiff's employ, had access to the LB Template, or precursor bid specification documents with any similarity to the LB Template, more than the "slightest doubt" is present here as to Blades' access and hence to defendant's infringement. *See also Perry-Anderson v. Howard Univ. Hosp.*, 192 F. Supp. 3d 136, 143 (D.D.C. 2016) ("Courts must avoid making 'credibility determinations or weighing the

evidence,' since 'credibility determinations, the weighing of the evidence, and the drawing of legitimate inferences from the facts are jury functions, not those of a judge.'") (cleaned up) (quoting *Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 150 (2000)).

### 2. *Substantial Similarity*

Even if no genuine issue of material fact existed as to whether defendant had "access" to the LB Template, plaintiff would still need to prove, as a matter of law, "that the defendant's work is 'substantially similar' to protectible elements of the plaintiff's work." *Sturdza v. United Arab Emirates* ("*Sturdza*"), 281 F.3d 1287, 1295 (D.C. Cir. 2002) (quoting *Feist*, 499 U.S. at 348, 361). Plaintiff maintains that defendant's alleged "copying itself demonstrates infringement of the specific language Lerch Bates developed to express its ideas." Pl.'s Mem. at 20–21.  As defendant effectively counters, however, Def.'s Opp'n at 13–19, genuine issues are presented as to whether the LB Template and the customized MBA Templates are substantially similar enough at the protectible level of expression to warrant summary judgment in plaintiff's favor.

"The substantial similarity inquiry consists of two steps.  The first requires identifying which aspects of the artist's work, if any, are protectible by copyright." *Sturdza*, 281 F.3d at 1295. For instance, the underlying facts of a compilation are not copyrightable, *Feist*, 499 U.S. at 348, and "copyright protection [also] does not extend to what are known as *scènes à faire*, *i.e.*, incidents, characters or settings which are as a practical matter indispensable, or at least standard, in the treatment of a given topic, or elements that are dictated by external factors such as particular business practices[.]" *Sturdza*, 281 F.3d at 1295–96 (quotation marks and citations omitted). "Once unprotectible elements such as ideas and *scènes à faire* are excluded, the next step of the inquiry involves determining whether the allegedly infringing work is 'substantially similar' to protectible elements of the artist's work." *Id.* at 1296.  "'Substantial similarity' exists where the accused work is so similar to the plaintiff's work that an ordinary reasonable person would

conclude that the defendant unlawfully appropriated the plaintiff's protectible expression by taking material of substance and value." *Id.* (quotation marks and citation omitted). Substantial similarity "turns on the perception of the 'ordinary reasonable person' or 'ordinary observer[.]'" *Id.* (citation omitted). "The substantial similarity determination requires comparison not only of the two works' individual elements in isolation, but also of their 'overall look and feel.'" *Id.* (quoting *Boisson v. Banian*, *Ltd*, 273 F.3d 262, 272 (2d Cir. 2001)). "[A]n allegedly infringing work is considered substantially similar to a copyrighted work if the ordinary observer, unless he set out to detect the disparities, would be disposed to overlook them, and regard their aesthetic appeal as the same." *Id.* (alteration in original) (quoting *Boisson*, 273 F.3d at 272).

Even assuming that plaintiff is correct that all unhighlighted language in the Highlighted LB Template is protectable—an assumption vigorously challenged by defendant given the differing stories about how plaintiff's employees drafted the unhighlighted text in the Highlighted LB Template or may have lifted such unhighlighted text from other sources, *see* Def.'s Opp'n, Tornquist Dep. Tr. at 148:3–11 (plaintiff's EVP conceding that he could not "tie any specific language in" the LB Template "to any specific contribution from any employee[,]" nor say precisely where the information that plaintiff's employees "contributed came from"), and given the common sensical nature of the instructions in the Text Excerpts, *see, e.g.*, Text Excerpts at 9 ("Contractor must review Contract Documents[.]" "Promptly incorporate required changes due to inaccurate data or incomplete definition.")—the issue of whether each customized MBA Template contains text that is "substantially similar" to copyright protected text in the LB Template is normally a jury question.[13]   The D.C. Circuit has explained that since "substantial similarity is

---

[13]     Citing the Eleventh Circuit's nonbinding decision in *Compulife Software Inc. v. Newman*, 959 F.3d 1288 (11th Cir. 2020), plaintiff argues that defendant bears the burden to demonstrate the unprotectability of the language in the LB Template that plaintiff claims is substantially similar to text in the customized MBA Templates. Pl.'s Mem. at 25. The *Compulife* court explained, in reversing a judgment rendered after a bench trial, that when, as part of the

customarily an extremely close question of fact, summary judgment has traditionally been frowned upon in copyright litigation.'" *Sturdza*, 281 F.3d at 1296 (quoting *A.A. Hoehling v. Universal City Studios, Inc.*, 618 F.2d 972, 977 (2d Cir. 1980)); *accord Atkins v. Fischer*, 331 F.3d 988, 993 (D.C. Cir. 2003); *Wickham v. Knoxville Int'l Energy Exposition, Inc.*, 739 F.2d 1094, 1097 (6th Cir. 1984) ("[S]ummary judgment . . . is a practice to be used sparingly in copyright infringement cases."); *SAS Inst., Inc.*, 64 F.4th at 1329–30 ("To be clear, whether copyright infringement has occurred is a factual determination that generally can be reached only after the legal determination of copyrightability has been made."). Questions about the "overall look and feel" of the LB Template and the customized MBA Templates, each of which have varying levels of similarity to the LB Template, are simply better answered by the jury.

In any event, the parties disagree about the extent to which the customized MBA templates parrot the LB Template, with plaintiff claiming that the customized MBA Templates copy "over half the material in" the LB Template, Pl.'s SMF ¶ 27, based on an eye-ball review by plaintiff's EVP, *see* Suppl. Tornquist Decl. ¶ 1, and defendant countering that the similarity ranges for at least two customized MBA Templates are between 22 and 10.1. percent, based upon analysis

---

substantial similarity analysis, a defendant challenges the allegedly copied part of a copyrighted work as unprotectable, due to the copied material being "intrinsic to the communication of an idea[,] [ ] procedure, [or] process," "taken from the public domain[,]" *id.* at 1304, or being "usual industry practice," *id.* at 1306, the defendant "must narrow the [protectability] inquiry by indicating where in the public domain that portion of the work can be found" or "indicate the standards that dictate that technique[,]" *id.*; *see also id.* at 1305–06 ("A plaintiff, for instance, can't be expected to present the entirety of the public domain as it existed when he authored his copyrighted material in order to show that no elements of his work were taken from it. Nor could a plaintiff reasonably introduce the entire corpus of relevant, industry-standard techniques just to prove that none of the material copied from his work constituted *scènes à faire*."). Defendant fails to address *Compulife, see generally* Def.'s Opp'n, and, other than identifying various species of unprotectability, *see* Def.'s Opp'n at 15–16, has offered little supporting evidence to back up these challenges. In any event, given that the questions of access and substantial similarity are ultimately jury questions here, the dispute about the unprotectability of any text plaintiff claims is copied from the LB Template in the customized MBA Templates may be dealt with at a pretrial Copyrightability Hearing with more fulsome submissions, including expert testimony, by the parties than that provided on the record now before the Court. *See SAS Inst., Inc. v. World Programming Ltd.*, 64 F.4th 1319, 1332–33 (Fed. Cir. 2023) (approving use of a so-called "Copyrightability Hearing" as reasonable pretrial procedure and case management tool to address efficiently issue of protectability so that a jury would be able to conduct a proper infringement analysis).

produced by a software program, Def.'s Resp. SMF ¶ 25.  Simply put, the debate between plaintiff

and defendant's analyses of the similarity between their respective works should not be resolved

*ex ante* at summary judgment.[14]

Accordingly, even if a valid copyright attaches to the LB Template generally and copyright

protectability extends to the text allegedly copied into the customized MBA Templates, genuine

issues of material fact preclude summary judgment on plaintiff's infringement claim.

### B.      Plaintiff Is Not Entitled to Defendant's Profits under § 504(b)

Under Count One, plaintiff seeks both injunctive relief and indirect profits, namely, the

portion of defendant's profits derived from the alleged infringement of plaintiff's copyright.  *See*

Pl.'s Opp'n at 8.  The Copyright Act permits copyright owners to obtain "actual damages and

profits" stemming from an infringement of their copyright.  *See Walt Disney Co. v. Powell*, 897

F.2d 565, 568 (D.C. Cir. 1990) (quoting 17 U.S.C. § 504(c)(1)); *see also* 17 U.S.C. § 504(b)

(specifying that the "copyright owner is entitled to recover . . . any profits of the infringer that are

attributable to the infringement").  The standard for plaintiff's initial burden under § 504(b) is

discussed below, followed by an application of that standard to the instant dispute.

### 1.      *Entitlement to an Infringer's Profits for Copyright Claims*

A copyright holder is entitled, under 17 U.S.C. § 504(b), to recover profits attributable to

the infringement.  In this way, the Copyright Act "aims to both compensate for the injury resulting

from infringement and to strip the infringer of the profits generated from infringement, in order to

---

[14]      Faced with the reality that the "'ordinary observer test' in this context" "raises potential issues of 'overall look and feel[,]'" plaintiff suggests employing the "fragmented literal similarity test" instead.  Pl.'s Mem. at 16–19 & n.3.  The latter test is employed by some courts in cases "where there is no word-for-word or literal similarity but where defendant has nonetheless appropriated the 'fundamental essence or structure' of plaintiff's work." *Africa Inst., Inc. v. Palmer*, 970 F.2d 1067, 1073 (2d Cir. 1992) (citation omitted).  The D.C. Circuit, however, has never endorsed the fragmented literal similarity test, and *Sturdza* requires that district courts follow the ordinary observer test in evaluating substantial similarity.  *See* 281 F.3d at 1296.  Accordingly, the fragmented literal similarity test will not be adopted here.

'make[ ] clear that there is no gain to be made from taking someone else's intellectual property without their consent.'" *Dash v. Mayweather* ("*Dash*"), 731 F.3d 303, 311–12 (4th Cir. 2013) (alteration in original) (citation omitted); *accord* quoting B. Nimmer & D. Dimmer, 4 NIMMER ON COPYRIGHT § 14.03[B] (2023) ("The purpose of the award of defendant's profits is to prevent the infringer from unfairly benefiting from a wrongful act."). "[T]o survive summary judgment on a demand for indirect profits pursuant to § 504(b)," however, "a copyright holder must proffer sufficient non-speculative evidence to support a causal relationship between the infringement and the profits generated indirectly from such an infringement." *Mackie v. Rieser*, 296 F.3d 909, 915–16 (9th Cir. 2002) (alteration in original); *accord Dash*, 731 F.3d at 327; *Leonard v. Stemtech Int'l Inc.* ("*Leonard*"), 834 F.3d 376, 395 (3d Cir. 2016); *Andreas v. Volkswagen of Am., Inc.* ("*Andreas*"), 336 F.3d 789, 796 (8th Cir. 2003); *On Davis v. The Gap, Inc.*, 246 F.3d 152, 160–61 (2d Cir. 2001); *Taylor v. Meirick*, 712 F.2d 1112, 1122 (7th Cir. 1983). The causation element "'obviates a good deal of mischief' in claiming profits beyond what might be attributable to the infringement, without diminishing the benefit § 504(b) confers on plaintiffs." *Polar Bear Prods., Inc. v. Timex Corp.*, 384 F.3d 700, 711–12 (9th Cir. 2004) (citation omitted) (quoting 4 NIMMER ON COPYRIGHT § 14.03[B])).

As the Fourth Circuit has persuasively explained, a defendant may "properly be awarded summary judgment [under § 504(b)] with respect to any given revenue stream if either (1) there exists no conceivable connection between the infringement and those revenues; or (2) despite the existence of a conceivable connection, [the plaintiff] offer[s] only speculation as to the existence of a causal link between the infringement and the revenues." *Bouchat v. Baltimore Ravens Football Club, Inc.* ("*Bouchat*"), 346 F.3d 514, 522–23 (4th Cir. 2003); *see also Mackie*, 296 F.3d at 914 (noting that § 504(b) does not differentiate between direct and indirect profits). "A proffered

connection will be considered 'conceivable' even if it is highly unlikely that the infringement actually contributed to the claimed revenues." *Dash*, 731 F.3d at 330. "After the plaintiff has alleged a conceivable connection between the infringement and the claimed revenues, . . . [she] must [then] prove the existence of a 'causal link between the infringement and the level of the [defendant's] revenues.'" *Id.* (third alteration in original) (quoting *Bouchat*, 346 F.3d at 524–25).

Caselaw elucidates the evidence to be proffered to satisfy plaintiff's initial burden and avoid summary judgment on a claim for lost profits. In *Bouchat*, an amateur artist, who created a drawing of a winged shield as a logo for the Baltimore Ravens, sought indirect profits from the football team, which had used the logo "as their primary identifying symbol" and in the team's "activities, including uniforms, stationery, tickets, banners, on-field insignia, and merchandise." 346 F.3d at 516–17. The Fourth Circuit upheld the grant of summary judgment in favor of the Ravens with respect to its § 504(b) liability, explaining that, "the revenues from minimum guarantee shortfalls and free merchandise" were based on licensing agreements predating the infringement and "lack[ed] all conceivable connection" to the infringement. *Id.* at 524. Likewise, though the remaining revenue streams on which summary judgment had been granted were theoretically connected to the infringement, the plaintiff had "offered only speculative evidence of a causal link between the infringement and the level of the revenues," and it "defie[d] credulity that a consumer would purchase NFL trading cards in order to catch a glimpse of the Flying B logo on a featured player's helmet; or video games, so as to see the logo on the simulated Ravens players; or a game program, simply because its artwork incorporated the Flying B." *Id.* at 524, 525 & n.10.

The Third Circuit's decision in *Leonard* is also instructive. There, a registered copyright owner brought a copyright infringement lawsuit against a nutritional supplement wholesaler for

using unlicensed copies of copyrighted photographs of stem cells.  834 F.3d at 395.  The Third Circuit affirmed summary judgment in favor of the defendant wholesaler on plaintiff's demand for indirect profits, even though plaintiff produced evidence that the copyrighted images were regularly used in promotional materials and proffered expert testimony that defendant used the photographs "to promote its brand, to promote understanding of its company and products, to train and recruit distributors and to provide those distributors with tools which were used to maximize [its] profits."  *Id.* (citation omitted).  The court opined that none "of this evidence shows how or why [the plaintiff's] images, as opposed to other aspects of [the defendant's] marketing materials, influenced profits" since the proffered evidence failed to "link customer decisions to purchase" the defendant's product with defendant's use of his images in its marketing materials, "as opposed to any other reason why a customer might purchase those products." *Id.* (citation omitted).

Finally, the Fourth Circuit's decision in *Bonner v. Dawson* demonstrates that a copyright owner's initial burden may be met by demonstrating that a stream of revenue was derived exclusively from the infringed work.  *See* 404 F.3d 290 (2005).  In *Bonner*, an architect sued a property owner and a contractor for infringing his copyrighted architectural plan, seeking profits resulting from leasing agreements for the building, which was constructed according to the infringed plan.  *Id.* at 292.  After a trial solely on the issue of damages, a jury awarded the architect actual damages in the amount of $10,707 but found that he was not entitled to defendants' profits stemming from the infringement.  *Id.* at 293.  Following the trial, plaintiff filed a Federal Rule of Civil Procedure 50(b) motion, arguing that he was entitled, as a matter of law, to defendants' profits stemming from the infringement.  *Id.*  The district court, however, denied plaintiff's motion, explaining that plaintiff had failed to satisfy his initial burden of proving a plausible causal link between the defendant's profits from the construction of the building and plaintiff's copyrighted

architectural design, and, further, even if such a link were found, that "the jury could have reasonably determined that [the defendants] satisfied their burden to show that the profits were derived from sources other than the infringement." *Id.*  The Fourth Circuit disagreed with the district court's conclusion that the plaintiff had failed to satisfy his initial burden, reasoning that the plaintiff proved a plausible causal connection because "the profits [were] generated by the leasing agreements in the infringed building[,]" which profits were "derived exclusively from the infringed building[.]" *Id.* at 294  Nevertheless, the Court affirmed the district court's denial of the plaintiff's Rule 50(b) motion because "[a] reasonable trier of fact could have concluded that the basis of the profits that [defendants] obtained from the construction and leasing of the building was unrelated to the exterior design[,]" pointing to record testimony that the tenant "would have gone forward with the lease even if a different facade had been used[.]" *Id.* at 295.[15]

Collectively, *Bouchat*, *Leonard*, and *Bonner* thus stand for the following principle: A copyright plaintiff seeking profits from an infringing defendant must show a plausible causal connection between the alleged infringement and the defendant's profits, either in the form of non-speculative evidence tying the infringement to the profits or by showing that the revenue stream in question is derived exclusively from the infringing work.

---

[15]     The Fourth Circuit explained, in *Dash,* the distinction to be drawn between *Bouchat* and *Bonner*, stating that "[i]n *Bouchat*, the causal link between the infringement and the profits alleged by the plaintiff required the jury to find that a football team's adoption of one logo design over another would cause consumers to purchase game programs, trading cards, or video games simply to see the infringing logo.  Although there was a conceivable connection between the infringement and the claimed sales of merchandise containing the Flying B logo, any causal link between the two was so unlikely as to defy credulity." 731 F.3d at 329 (cleaned up).  "In contrast, the plaintiff in *Bonner* had presented evidence that the claimed revenues were derived solely from a building that infringed the plaintiff's architectural designs.  This was sufficient to prove some causal link between the infringement of the designs and the revenues from the building based on those designs, even if further evidence showed that the infringed designs did not actually increase the building's revenues." *Id.* (citation omitted); *see also id.* at 332 (observing that "in some cases, like *Bonner*, the infringement will form such a significant aspect of the product generating the claimed revenues that no further evidence will be required to establish that those revenues were causally linked to the infringement").

2.      ***Plaintiff Cannot Satisfy Its Initial Burden***

The parties' dispute centers around whether plaintiff has satisfied its initial burden to demonstrate a plausible causal connection between defendant's allegedly infringing customized MBA Templates and its profits from the 98 projects where these customized templates were used. The crux of defendant's argument is that plaintiff has failed to present "even a scintilla of evidence" that "any of the property owners" for these 98 projects "based their decision to utilize MBA's services due to the MBA Specification Template." *See* Def.'s Cross-Mot. at 14. Plaintiff insists that its initial burden for judgment to obtain indirect profits from defendant is sufficiently satisfied by identifying "the revenue streams directly resulting from 1) the creation of the infringing materials, and 2) their use as part of Blades' consulting services." Pl.'s Mem. at 31–32.

Evaluating the record evidence here through the two-step framework articulated in *Bouchat* shows that defendant is right. Certainly, a "conceivable" connection exists between defendant's alleged infringement of the LB Template and its consulting profits because certain text in defendant's MBA Template allegedly reflects protectable, copyrighted parts of the LB Template, *see* Highlighted Customized MBA Templates, and the MBA Template is used in connection with defendant's consulting services. Unlike the category of the Ravens' revenues that predated the infringement in *Bouchat*, defendant's customized MBA Templates were used in connection with its consulting services with clients after the LB Template was published in 2009. *See* Pl.'s SMF ¶ 34 (noting that "all but Exhibits 44, 51, 58, 62, 69, 79, 83, 91, and 93" of the 98 customized MBA Templates "reflect dates postdating the March of 2018 cease and desist letter"); *see also* Min. Order (Jan. 20, 2021) (limiting discovery on the issue of actual damages "for the period from August 17, 2017 to the present")

Plaintiff has adduced no evidence, however, to suggest that the conceivable connection between the alleged infringement and defendant's profits is a plausible one. Here, the record

evidence shows that the customized MBA Templates are not provided to defendant's prospective clients before a consulting contract is signed.  *See* Def.'s SMF ¶ 16; Blades Decl. ¶ 9.  Instead, the LB and MBA Templates only become useful after being modified, or customized, to fit the parameters of a specific project.  *See* Def.'s Cross-Mot., Tornquist Dep. Tr. at 156:12–157:2; Def.'s SMF ¶ 9.  Thus, the customized MBA Templates—and any infringing contents therein— are not the source of clients retaining defendant.  As defendant's unrebutted description of the parties' elevator consulting business makes clear, the value add that consultants provide in the elevator modernization and construction business is not "the generic form that is used to compile information for that specific project" but rather the "knowledge and expertise with regard to elevator products and installation and maintenance of those products" because each project is "unique and the actual information provided to the client is unique and not dependent in any manner on the precise phraseology or language of the generic form."  Def.'s Objs. Pl.'s Discovery Reqs. at 2–3, ECF No. 22.  Defendant's explanation is buttressed by the fact that its consulting agreements call for defendant to provide significant support to project owners as they navigate the elevator construction or modernization process, from holding discussions with the elevator contractors, as necessary, "to answer any queries" and attending "interview meetings with the client to hold discussions with bidders whose proposals are viable and competitive[,]" Sample Consulting Agreement at 11, to reviewing the work of the contractor performing the elevator modernization or construction service to confirm that the work is proceeding in accordance with the customized MBA template, *see* Pl.'s SMF ¶ 39.

  This information, along with plaintiff's concession that other elevator consultants, like defendant, could use the same elevator specifications in the LB Template*, "just using different phrasing*," Def.'s Cross-Mot, Tornquist Dep. Tr. at 117:7–10 (emphasis added), effectively slams

shut the door on indirect profits here. Plaintiff's concession is consistent with *Feist*, which explained that, although compilations—like the LB Template—may be copyrightable, the underlying facts, such as the content of the specifications themselves, are not. 499 U.S. at 348. Simply put, no record evidence exists that would suggest the infringed material here—the manner in which the customized MBA Templates expressed instructions, standards, or elevator specifications—induced any of the clients in the 98 agreements at issue to choose defendant's services, particularly since plaintiff's EVP could not identify a single instance in which the LB template was recognized in the marketplace. *See* Def.'s SMF ¶ 12. Just as the plaintiff in *Leonard* offered nothing more than mere speculation that the defendant's use of his images in defendant's marketing materials influenced its profits, so too has plaintiff here offered nothing but speculation that any allegedly infringing material in defendant's customized MBA Template, such as the phrasing used in conveying the content of the elevator specification, which prospective clients do not see until after the consulting agreement is signed and cannot otherwise access online, played any role in defendant securing those agreements. Similar to how, in *Bouchat,* the position "that a consumer would purchase NFL trading cards in order to catch a glimpse of the Flying B logo on a featured player's helmet[,]" in the Court's words, "defie[d] credulity," 346 F.3d at 525 n.10, plaintiff's position here that a project owner procured defendant's consulting services because of how defendant phrased its elevator specifications when the customized MBA Template was not revealed until after defendant's retention, likewise belies reality.[16]

---

[16]    Plaintiff counters that the facts of this case are distinguishable from the Third Circuit's decision in *Leonard* and more similar to the Eight Circuit's decision in *Andreas*, an "advertising case" concerning indirect profits, Pl.'s Opp'n at 13, but that comparison misses the mark. In *Andreas*, the Eighth Circuit held that a plaintiff adequately established the causal nexus between an automobile manufacturer's use plaintiff's copyrighted poem in a widely-aired commercial for entitlement to a portion of profits from the sale of the automobile because the evidence at trial showed, *inter alia*, that the "infringement was the centerpiece of [the] commercial that essentially showed nothing but [the advertised product]" and that "sales of the [product] during the period that the commercial aired were above [the infringing manufacturer's] projections." 336 F.3d at 796–97. Even though the specification and bidding templates are an important component of defendant's consulting services, plaintiff has not shown that defendant's use of the

Furthermore, unlike *Bonner*, a case upon which plaintiff relies, Pl.'s Mem. at 30–31, defendant's revenues from its consulting services are not exclusively derived from the portions of defendant's customized MBA Templates containing the allegedly infringing content.  Instead, defendant provides other consulting services during the "Bidding and Negotiation" and "Construction Services" phases of a consulting agreement, such as holding discussions with elevator contractors, issuing modifications to specifications and bidding materials as necessary, and reviewing the work of the contractor performing the elevator modernization or construction service to confirm that the work is proceeding in accordance with the specifications and contract. *See* Pl.'s SMF ¶ 39; Sample Consulting Agreement at 10–11.  Even when isolating defendant's revenue stream to the revenue received in the "Construction Documents" phase of each consulting agreement, defendant's bidding materials are not verbatim copies of the MBA or LB Templates. Rather, the MBA Template is modified or customized to fit the demands of a given elevator modernization or new construction project and the needs of the building owner or manager, with the result that defendant's revenue necessarily cannot be derived *exclusively* from the allegedly infringing material.

Plaintiff asserts several counterarguments to show that its initial burden has been satisfied, but none withstand scrutiny.  First, plaintiff analogizes defendant's use of its allegedly copyrighted material to "a writer who a client hires to produce a certain work" but "commit[s] copyright infringement in producing the work."  Pl.'s Opp'n at 11. This analogy is premised on a false equivalence.  The profits that a writer derives from a written work stemming from a copyright infringement is necessarily causally connected to the infringement since the writer was hired to produce the unique content of the work itself.  By contrast, plaintiff has conceded that the content

---

style, formatting, and phrasing of the content of the highlighted material in the customized MBA Templates could have, unlike in *Andreas*, plausibly played any role in driving customer decisions.

of the allegedly infringing parts of defendant's bidding materials is fair game for other consultants to use so long as they express or phrase the specifications differently than plaintiff does since the underlying facts are not copyrightable.  Furthermore, in plaintiff's hypothetical, the client hires the writer presumably due to knowledge or awareness of the writer's literary talent or having read the writer's previous literary works.  The opposite is true here, where defendant's clients do not see the MBA Template (nor the content in the LB Template for that matter) before retaining defendant as a consultant.  As defendant also persuasively argues, "in the example of a copyright of a song, it is the melody, chords, and overall nature of the sound that is produced that is the thing of value, the work[,]" but "[t]he opposite is true for a specification" because "[a] specification must be clear, direct, and consistent with the expectations of the industry . . . [and] be thorough and address all important elements of the product or project at issue."  Def.'s Reply at 8.  Finally, since the writer's revenue stream is derived exclusively from the infringed work, the copyright plaintiff in this hypothetical would automatically satisfy her initial burden under *Bonner*, unlike defendant here. These salient differences between a writer producing a free-form written work and defendant's alleged infringement of a template, the contents of which must be tightly tethered to and reflect industry standards, legal and regulatory requirements, and terms generally employed in the industry, render the plaintiff's analogy a misfit.

Second, plaintiff turns to the decision in *William A. Graham v. Haughey* ("*William*"), 568 F.3d 425 (3d Cir. 2009), to support its causal connection argument, Pl.'s Mem. at 31, but that Third Circuit decision only illustrates why plaintiff has failed to satisfy its initial burden here.  In *William*, the owner of an insurance brokerage firm sued his former employee (and that employee's new employer) for use of the owner's copyrighted form language in the new employer's proposals to prospective clients.  *Id.* at 430.  Holding that the plaintiff had satisfied his initial burden, the Third

Circuit explained that plaintiff provided powerful record evidence, including: (1) expert evidence indicating that the defendant employer's revenues increased by using the infringing language in proposals; (2) testimony from the defendant employee that "some clients were convinced to purchase insurance through [the defendant employer] on the basis of the proposals[;]" and (3) plaintiff's evidence that the copywritten form language was "valuable in part because [it] could be easily copied to provide consistent and accurate explanations of coverage comprehensible to lay people." *Id.* at 442.  Plaintiff has adduced none of this type of evidence connecting defendant's profits to the alleged infringing language.

Finally, plaintiff cites *Wood v. Houghton Mifflin Publishing Company*, 589 F. Supp. 2d 1230 (D. Colo. 2008), for the proposition that to satisfy the initial burden necessary to sustain a claim for indirect profits, a copyright plaintiff need not evince that the salability of defendant's product turned on the use of the infringing materials, Pl.'s Opp'n at 15, but this is a misreading of this out-of-district case.  In *Wood*, the court held that a photographer had satisfied his initial burden on proving a plausible causal connection between the defendant textbook publisher's infringement of his copyrighted photographs, even though the photographs at issue comprised only a small portion of the defendant's textbooks and periodicals.  *Id.* at 1248.  Again, however, the use of photographs in a textbook more obviously contribute to the salability of a textbook, as opposed to how elevator specifications are described or phrased in bidding materials—particularly when the latter materials are only provided to the client *after* the contract is executed.  *See id.* at 1247 (observing that "good photographs and artwork are a factor, generally, in the [salability] of language arts materials").

In sum, although a conceivable connection between defendant's alleged infringement of plaintiff's LB Template and defendant's consulting profits exists, plaintiff has provided no non-

speculative evidence adducing a plausible connection between the two.  Resultantly, defendant is entitled to summary judgment on its liability for profits under § 504(b).

## IV.     CONCLUSION

For the foregoing reasons, assuming the validity of plaintiff's copyright on the LB Template, summary judgment on plaintiff's copyright infringement claim is precluded by genuine issues of material fact as to whether defendant had access to the LB Template and whether defendant's customized MBA Templates are substantially similar to the LB Template.  Defendant, however, is entitled to summary judgment with respect to its liability for profits, under 17 U.S.C. § 504(b), because plaintiff cannot evince a plausible causal connection between defendant's profits and the alleged infringement.  Finally, plaintiff's discovery motion is denied as moot given that discovery on the issue of profits under § 504(b) is no longer necessary.

Accordingly, plaintiff's motion for summary judgment is denied, defendant's cross-motion for summary judgment is granted, and plaintiff's discovery motion is denied as moot.

An order consistent with this Memorandum Opinion will be published contemporaneously.

Date:  September 26, 2023

_____
**BERYL A. HOWELL**
United States District Judge